**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**GEORGE WILSON; THORNELL BROWN; CASEY JENKINS; CURTIS SIMPKINS; AARON FOWLER; and CHARLES BAKER, on behalf of themselves and all others similarly situated** — **PLAINTIFFS**

**V.** — **CASE NO. 5:21-CV-5194**

**J.B. HUNT TRANSPORT, INC.** — **DEFENDANT**

# MEMORANDUM OPINION AND ORDER

Now before the Court are Defendant J.B. Hunt Transport, Inc.'s Motion to Dismiss (Doc. 44) and Brief in Support (Doc. 45), Plaintiffs' Response (Doc. 53), and J.B. Hunt's Reply (Doc. 54). The Court entertained argument on the Motion during a hearing on July 5, 2022. Following argument, the Court **GRANTED** the Motion from the bench and dismissed Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(1) due to lack of standing. Below, the Court sets forth in greater detail its reasons for dismissing the case. To the extent this Order differs from what was stated from the bench, this Order will control.

## I. BACKGROUND

This case is a purported class action filed by six Plaintiffs from several states. The Second Amended Complaint (Doc. 32), which is the operative pleading, identifies a number of state-specific subclasses, each headed by a named Plaintiff. According to the Second Amended Complaint, the Plaintiffs and purported class members submitted online employment applications to Defendant J.B. Hunt Transport, Inc., an Arkansas-based trucking company, between August 17, 2020, and July 2, 2021. In order to apply for truck driving jobs, Plaintiffs logged onto J.B. Hunt's website and were directed to an



EXHIBIT
tabbies
7

online employment "portal" powered by a software program called Microsoft Power Apps.[1] Once they reached the portal, Plaintiffs would input their names, addresses, phone numbers, and social security numbers on the online job applications. Plaintiffs characterize this data, generally, as their "personally identifying information," or "PII." To be clear, Plaintiffs do not allege they purchased anything from J.B. Hunt nor inputted their bank account and/or credit card information on the portal.

The Second Amended Complaint begins with the allegation that Plaintiffs' PII was "continuously exposed by [J.B. Hunt] *and accessed* by unknown, unauthorized actors" from August 17, 2020, to July 2, 2021. *Id.* at ¶ 5 (emphasis added). However, later on in the pleading, Plaintiffs acknowledge they are not certain whether anyone actually accessed their PII and are only worried that such access might have occurred. *See, e.g.*, ¶¶ 15, 40. The source of Plaintiffs' worry about the security of their PII comes from a report published online by a private, for-profit company called UpGuard. According to the Second Amended Complaint, UpGuard employs a "Cyber Risk Research Team" to test software for potential vulnerability to cyberattack. *Id.* at ¶ 42. On May 24, 2021, an UpGuard analyst discovered that Microsoft Power Apps software was vulnerable to cyberattack in the program's "default" configuration setting. *See*

[1] "Microsoft Power Apps are a product for making 'low code,' cloud-hosted business intelligence apps. Power Apps portals are a way to create a public website to 'give both internal and external users secure access to your data.' Users can create websites in the Power Apps UI with application capabilities like user authentication, forms for users to enter data, data transformation logic, storage of structured data, and APIs to retrieve that data by other applications. Portals provide a public website for interacting with those apps. Typically, a business unit or polity uses a portal as an interface with a closely-related audience like customers, sales partners, employees, or citizens." (Doc. 32, ¶ 44) (quoting https://www.upguard.com/breaches/power-apps).

https://www.upguard.com/breaches/power-apps (last accessed Sept. 29, 2022).[2] Shortly after making this discovery, UpGuard reported it to Microsoft. A few days later, Microsoft informed UpGuard that it had investigated UpGuard's tip but did not intend to take further action. *Id.* Undeterred, UpGuard reached out directly to various governmental and private entities that used Power Apps for their hiring needs. *Id.* These entities included American Airlines; Denton County, Texas; Ford Motor Company; Maryland Department of Health; New York City Municipal Transportation Authority; New York City Schools; the State of Indiana; and J.B. Hunt—the Defendant in the instant case. *Id.* On August 21, 2021, UpGuard published its online report documenting its discovery of the Power Apps vulnerability. *Id.*

According to UpGuard's report, at least 47 different governmental bodies and private companies use Microsoft Power Apps to store information about job applicants. *Id.* UpGuard made contact with J.B. Hunt on July 2, 2021, and reported that by July 7, 2021, J.B. Hunt had located the vulnerability and secured the portal. *Id.* UpGuard believed the vulnerable data on J.B. Hunt's portal included job applicants' full names, email addresses, physical addresses, phone numbers, social security numbers, and drug screening information. *Id.*

UpGuard's report is one of two sources of information Plaintiffs cite in their Second Amended Complaint to explain the alleged vulnerability in the J.B. Hunt's employment

---

[2] The Court finds that UpGuard's report is not outside the pleadings for purposes of assessing Defendant's Rule 12 Motion. *See Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) ("Documents necessarily embraced by the pleadings include documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading.") (internal quotation and citation omitted). UpGuard's online report is cited throughout the Second Amended Complaint and is hyperlinked at footnotes 4 and 14. *See* Doc. 32, pp. 3, 10.

portal. The other source of information is a letter J.B. Hunt sent to all individuals who applied for jobs using the portal from August 2020 to July 2021. *See* Doc. 32-1. J.B. Hunt sent this letter on or about October 18, 2021, after it fixed the vulnerability UpGuard had identified in the Power Apps program. *See* Doc. 32-1.[3] The letter reads as follows:

> J.B. Hunt has completed its investigation into a security incident involving a configuration error in the Microsoft Power Apps portal used by J.B. Hunt to create driver applications. Upon learning of the incident, we immediately took steps to secure the portal. The investigation determined that certain applicant information could have been accessed by an unauthorized actor between August 17, 2020 through July 2, 2021. We completed a careful review of the data and, on September 10, 2021, determined that the files contained your name and Social Security number.
>
> We take this incident very seriously. J.B. Hunt is offering you a complimentary one-year membership to Experian's® IdentityWorksSM. This product helps detect possible misuse of your personal information and provides you with identity protection services focused on identification and resolution of identity theft. IdentityWorks is completely free to you and enrolling in this program will not hurt your credit score . . . .
>
> We regret any inconvenience or concern this incident may cause you. To help prevent something like this from happening in the future, we have reviewed permissions to access data in the cloud, made modifications for all cloud services, and implemented other measures to help prevent unauthorized access to our data.

(Doc. 32-1).

Though the notice letter only states that Plaintiffs' PII "*could have been accessed* by an unauthorized user," the Second Amended Complaint asserts that an unauthorized user or users *did access* Plaintiffs' PII. *Id.* (emphasis added). Throughout the Second Amended Complaint, Plaintiffs refer to a "Data Breach" of J.B. Hunt's portal—without specifying why they believe a breach actually occurred, who might have breached the

---

[3] J.B. Hunt's notice letter is reproduced word-for-word in Paragraph 38 of the Second Amended Complaint, and the actual letter Plaintiff Wilson received is attached as an exhibit to the Second Amended Complaint. *See* Doc. 32-1. Accordingly, the Court finds that the notice letter is embraced by the Second Amended Complaint and is not considered outside the pleadings.

data, or when such a breach took place. *See, e.g.*, Doc. 32, ¶ 5. Neither UpGuard's report nor J.B. Hunt's letter claims that an actual breach occurred. Regardless, some Plaintiffs believe their PII was accessed by hackers and may be misused in the future, while other Plaintiffs point to incidents of actual identity theft and surmise that hackers stole their personal information from J.B. Hunt's website. Plaintiffs accuse J.B. Hunt of failing to adequately protect their PII from exposure and misuse.

According to the Second Amended Complaint, three of the six named Plaintiffs—Wilson, Brown, and Baker—assert they suffered injuries related to the possibility their PII was stolen and may be misused in the future; relatedly, they claim damages for annoyance, anxiety, and wasted time monitoring their bank accounts and credit reports for evidence of identity theft. *See id.* at ¶¶ 75–83, 84–91, 124–133. They fear they "face a lifetime risk of identity theft." *Id.* at ¶ 13. These three Plaintiffs also believe their PII has inherent monetary value that has now been diminished due to the possibility it was stolen. *See, e.g., id.* at ¶ 80.

The other three named Plaintiffs—Fowler, Jenkins, and Simpkins—allege they suffered actual injuries due to identity theft, and they blame those injuries on J.B. Hunt. *See id.* at ¶¶ 92–102, 103–113, 114–123. Plaintiff Fowler noticed an increase in suspicious and "scam" telephone calls from unknown third parties who "appear[ed] to have" his PII, as well as "unauthorized charges made on his bank account on two separate occasions." *Id.* at ¶¶ 95–96. Plaintiff Jenkins asserts that "unknown third parties applied for a replacement Social Security number using his name and PII and applied for both auto and furniture loans using his name and PII" and that "unknown individuals" attempted to rent a residence in his name. *Id.* at ¶ 106. He also maintains that, as a

result of these fraudulent activities, his credit score decreased and he "was forced to place a 'pause' on his credit," which "resulted in [him] suffering a delay in receiving a USDA grant." *Id.* at ¶ 107. Lastly, Plaintiff Simpkins alleges that an unknown third party applied for unemployment benefits using his name and PII, and when Simpkins attempted to apply for unemployment benefits himself, he was denied due to the previous, fraudulent application. *Id.* at ¶ 116. Plaintiff Simpkins was asked to prove his identity to the Social Security Administration and had to apply for and be issued a new Social Security number. *Id.* In addition, Plaintiff Simpkins complains he received unsolicited credit cards in the mail, which is yet another reason he believes his PII was stolen. *Id.* at ¶ 117.

J.B. Hunt filed a Motion to Dismiss (Doc. 44) on March 31, 2022. The Motion argues the Second Amended Complaint should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) because there are no facts to demonstrate that the named Plaintiffs have Article III standing to sue. J.B. Hunt contends that Plaintiffs Wilson, Brown, and Baker have not suffered any present or clearly imminent injuries caused by J.B. Hunt, and Plaintiffs Fowler, Jenkins, and Simpkins have failed to assert facts to plausibly show their actual injuries were causally connected to J.B. Hunt's Power Apps portal. In the alternative, J.B. Hunt moves to dismiss each cause of action under Rule 12(b)(6) for failure to state a claim.

As explained below, the Court finds that all Plaintiffs lack standing. The first set of Plaintiffs (Wilson, Brown, and Baker) can point to no facts to show they suffered injuries that are concrete, particularized, and actual or imminent. The second set of Plaintiffs (Fowler, Jenkins, and Simpkins) can point to no facts to show their injuries were likely caused by J.B. Hunt. Because the Court grants J.B. Hunt's Motion under Rule 12(b)(1),

the Court will not consider J.B. Hunt's alternative request for dismissal under Rule 12(b)(6).[4]

## II. LEGAL STANDARD

To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citation omitted). "As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing." *Id.* at 2207.

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). However, the plaintiff's allegations must be sufficient "to support a reasonable and plausible inference that she satisfies the elements of Article III standing," *Hawse v. Page*, 7 F.4th 685, 688–89 (8th Cir. 2021), in keeping with the pleading requirements stated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557(2007).

---

[4] It has now been approximately three months since the Court held its hearing on the Motion and signaled its intent to dismiss the case for lack of standing. In that time, Plaintiffs have not asked the Court to reconsider its ruling, nor have Plaintiffs submitted a proposed amended complaint to address the Court's concerns about standing. Accordingly, the Court considers its dismissal to be final and immediately appealable. *See Mtn. Home Flight Serv., Inc. v. Baxter Cnty.*, 758 F.3d 1038, 1045 (8th Cir. 2014) ("While a party may still file a motion for leave to amend and amendments should be granted liberally, such a motion would be inappropriate if the district court has clearly indicated either that no amendment is possible or that dismissal of the complaint also constitutes dismissal of the action.") (cleaned up).

Finally, in a case involving class allegations, "[a] putative class action can proceed as long as one named plaintiff has standing." *In re SuperValu*, 870 F.3d 763, 768 (8th Cir. 2017). "Accordingly, at least one of the [six] named Plaintiffs must have Article III standing in order to maintain this class action." *Id.* (quotation and citation omitted).

## III. DISCUSSION

### A. Plaintiffs Wilson, Brown, and Baker

The Second Amended Complaint does not plausibly allege that Plaintiffs Wilson, Brown, and Baker suffered any injuries that are concrete, particularized, actual, or imminent. At most, these Plaintiffs contend they were exposed to a risk of future harm and that this risk has caused them to suffer fear and anxiety. Relatedly, they claim they have lost valuable time monitoring their credit reports and banking statements for evidence of identity theft or fraud. They believe their PII has intrinsic value that has decreased due to the mere possibility that hackers stole it.

As the Court alluded to in its recitation of the facts, Plaintiffs have labeled what happened here as a "data breach," when they cite to no facts to plausibly show that anything of the sort actually occurred. An inattentive reader reviewing the Second Amended Complaint could easily assume, based on Plaintiffs' misleading characterization of the facts, that competent evidence exists to show that unknown individuals exploited the vulnerability in J.B. Hunt's Power Apps portal by viewing, downloading, or otherwise accessing Plaintiffs' PII. In fact, Plaintiffs have no facts to

indicate a data breach occurred and that their PII "was . . . accessed by unknown, unauthorized actors." (Doc. 32, ¶ 5).[5]

Plaintiffs Wilson, Brown, and Baker argue they "face a lifetime risk of identity theft" due to the possibility someone accessed J.B. Hunt's website. (Doc. 32, ¶ 13). However, a claim for damages predicated solely on a possibility or risk of future harm is not cognizable and is insufficient to establish standing as a matter of law. In *TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190 (2019), the Supreme Court considered a case in which a credit-reporting agency placed inaccurate alerts on customers' internal credit files. Certain customers worried that TransUnion might pass on this inaccurate information to third parties seeking credit verifications, and if that happened, the customers' credit rating could be damaged. TransUnion's customers decided to sue the company for failing to use reasonable procedures to ensure the accuracy of their internal credit files. Upon review, the Supreme Court found the customers' injuries too speculative to confer standing. They lacked facts to show that "the risk of future harm materialized—that is, that the inaccurate . . . alerts in their internal TransUnion credit files were ever provided to third parties or caused a denial of credit." *Id.* at 2212.

To illustrate the point about speculative injury, the *TransUnion* Court offered the following analogy:

> Suppose that a woman drives home from work a quarter mile ahead of a reckless driver who is dangerously swerving across lanes. The reckless

[5] Of course, the facts show that UpGuard's analyst accessed the J.B. Hunt portal and presumably viewed confidential PII; however, Plaintiffs do not claim the analyst is the "unauthorized user" they fear may have stolen their data. During the motion hearing, Plaintiffs' counsel described UpGuard as a "white hat" who should be "applaud[ed] for "bring[ing] attention to these issues." (Doc. 62, p. 21). The Court pressed Plaintiffs' counsel on whether he could cite to any facts to plausibly show a data breach occurred, and counsel responded that a breach was only "possible," given the facts. *Id.*

> driver has exposed the woman to a risk of future harm, but the risk does not materialize and the woman makes it home safely. As counsel for TransUnion stated, that would ordinarily be cause for celebration, not a lawsuit. But if the reckless driver crashes into the woman's car, the situation would be different, and (assuming a cause of action) the woman could sue the driver for damages.

*Id.* at 2211.

Applying this example to the case at bar, J.B. Hunt's swift corrective response to UpGuard's report could have been cause for celebration; instead, Plaintiffs filed suit. They worried that perhaps someone besides UpGuard's analyst also located the vulnerability in Power Apps and exploited it. The problem with Plaintiffs' reasoning, however, is that standing requires more than a fear of possible future harm. Plaintiffs Wilson, Brown, and Baker assert no facts to show their PII was accessed. But even they did, their PII was not misused—which, under the precedent in *TransUnion*, means they have no standing to sue J.B. Hunt. *See Reilly v. Ceridian Corp.*, 664 F.3d 38, 45 (3rd Cir. 2011) ("In data breach cases where no misuse is alleged, however, there has been no injury—indeed, no change in the status quo . . . . Moreover, there is no quantifiable risk of damage in the future. Any damages that may occur here are entirely speculative and dependent on the skill and intent of the hacker.").

Plaintiffs Wilson, Brown, and Baker also argue they have standing because they incurred certain costs associated with monitoring their PII for possible misuse. Instructive here is the Eighth Circuit's opinion in *In re SuperValu, Inc.*, 870 F.3d 763, 771 (8th Cir. 2017), which involved a retail grocery store chain that was sued by its customers following two cyberattacks. Immediately after the first cyberattack, SuperValu issued a press release confirming that its customers' credit card information *was accessed* by website hackers. *Id.* at 766. After the second attack, the company issued a second press release

admitting "that an intruder installed different malicious software onto the same network" and "may have captured Card Information from debit and credit cards used to purchase goods at their stores." *Id.*

The plaintiffs in *SuperValu* clearly stated facts to plausibly show that hackers accessed their sensitive data. After all, the company admitted those facts. By contrast, J.B. Hunt never advised Plaintiffs that anyone saw or accessed their PII, and UpGuard similarly had no evidence of unauthorized access. Importantly, though, despite the fact that "the complaint [in *SuperValu*] sufficiently allege[d] that the hackers stole plaintiffs' Card Information," *id.* at 769, this was not enough to establish standing for most of the plaintiffs. Only one plaintiff had standing to sue, and that plaintiff had standing because: (1) his personal information was actually misused and (2) the misuse was plausibly connected to SuperValu's data breach. All the other *SuperValu* plaintiffs were dismissed from the case, since their standing could not be premised on "a mere possibility" that their stolen data might be misused in the future. *Id.*

Plaintiffs Wilson, Brown and Baker's final argument is that the costs of identity-theft mitigation or monitoring are sufficient, in and of themselves, to establish standing. This argument is also rejected in *SuperValu.* There, the court found that "[b]ecause plaintiffs have not alleged a substantial risk of future identity theft, the time they spent protecting themselves against this speculative threat cannot create an injury." *Id.* Stated another way, Plaintiffs Wilson, Brown, and Baker "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. They cannot meet Article III's

standing requirements simply "by making an expenditure based on a nonparanoid fear" or by incurring costs "in response to a speculative threat." *Id.*

For all these reasons, Plaintiffs Wilson, Brown, and Baker's claims are **DISMISSED WITHOUT PREJUDICE** under Rule 12(b)(1).

**B. Plaintiffs Fowler, Jenkins, and Simpkins**

Unlike the other three Plaintiffs, it appears from the face of the Second Amended Complaint that Plaintiffs Fowler, Jenkins, and Simpkins suffered concrete, non-speculative injuries related to the misuse of their PII. Unfortunately, they still lack facts to plausibly show their PII was accessed or stolen from J.B. Hunt's website in the first place. Essentially, they ask the Court to assume that since they experienced identity theft, the source or cause of that theft must be J.B. Hunt's vulnerable Power Apps portal. Such allegations are conclusory in nature and do not survive *Iqbal* and *Twombly*'s plausibility test.

"A plaintiff invoking the jurisdiction of the court must demonstrate standing to sue by showing that she has suffered an injury in fact that is fairly traceable to the defendant's conduct and that is likely to be redressed by the relief she seeks." *SuperValu*, 870 F.3d at 768. In other words, it is not enough for Plaintiffs Fowler, Jenkins, and Simpkins to simply allege they suffered actual injuries related to the misuse of their PII. They must also allege facts to plausibly show that these injuries are "fairly traceable" to J.B. Hunt's acts or omissions. Because they cannot plausibly show that anyone (with the exception of UpGuard's analyst) knew of the vulnerability in Power Apps and accessed PII from J.B. Hunt's portal, Plaintiffs cannot tie their identity-theft injuries to J.B. Hunt—except through a series of "what-if" scenarios that are plainly insufficient. *See Reilly v. Ceridian Corp.*,

664 F.3d 38 (3d Cir. 2011) (rejecting plaintiffs' standing argument as too speculative because their injuries could not be "describe[d] . . . without beginning . . . with the word 'if'").

Although Plaintiff Fowler noticed an increase in suspicious and "scam" telephone calls from unknown third parties who "appear[ed] to have" his PII, as well as "unauthorized charges made on his bank account on two separate occasions," (Doc. 32, ¶¶ 95–96), he states no facts that would tend to show that his phone number was stolen from J.B. Hunt's portal, as opposed to some other source. Similarly, he fails to explain how bank fraud is related to J.B. Hunt's portal, as his bank account information was not provided to J.B. Hunt. UpGuard's analyst noted the "unsecured" data on J.B. Hunt's portal included only applicant names, email addresses, physical addresses, phone numbers, social security numbers, job titles, and drug screen results. *See* https://www.upguard.com/breaches/power-apps (last accessed Sept. 29, 2022).

Plaintiff Jenkins asserts that "unknown third parties applied for a replacement Social Security number using his name and PII and applied for both auto and furniture loans using his name and PII" and that "unknown individuals" attempted to rent a residence in his name. (Doc. 32, ¶ 106). However, he also fails to point to any facts that would tend to show the source of this stolen PII was J.B. Hunt.

As for Plaintiff Simpkins, he alleges that unknown third parties applied for unemployment benefits using his name and PII and that he received unsolicited credit cards in the mail—all because of the vulnerability in J.B. Hunt's portal. *Id.* at ¶¶ 116–117. Again, Simpkins cites to no plausible facts to support his suppositions.

Plaintiffs urge the Court to examine the case of *Coffey v. OK Foods, Inc.*, 2022 WL 738072 (W.D. Ark. Mar. 10, 2022), which they maintain is factually similar to the case at bar and which survived a motion to dismiss based on a challenge to standing. The Court has carefully reviewed *Coffey* and disagrees that the facts are similar. The defendant in *Coffey* sent a notice to its employees—not unlike the one J.B. Hunt sent to Plaintiffs—admitting that

> an unknown third party accessed an OK Foods employee email which contained employee data, including names and Social Security numbers. An outside cybersecurity firm investigated the data breach, and in April 2021 OK Foods notified employees if their personal information was part of the data breach. OK Foods provided affected employees with a free, one-year Experian IdentityWorks membership [to monitor their credit scores].

*Id.* at 1. Critical to the *Coffey* court's finding regarding the plaintiff's standing was the fact that "there [wa]s no dispute that Plaintiff's name and Social Security number were part of a data breach and accessed by an unknown third party." *Id.* at *3. The Plaintiffs in the case at bar cannot plausibly make the same claim. Here, there is are no facts showing a data breach, and there are no facts showing access by an unknown third party. The fact that a data breach actually occurred was the "causal link" the court in *SuperValu* relied on in finding that one plaintiff's allegations "of actual misuse of his Card Information" gave him standing to sue, while the other plaintiffs' fears of future injury were too speculative to establish standing. *SuperValu*, 870 F.3d at 768.

Accordingly, Plaintiffs Fowler, Jenkins, and Simpkins have failed to establish Article III standing to sue, and their claims are **DISMISSED WITHOUT PREJUDICE** under Rule 12(b)(1). As no named plaintiffs remain in the lawsuit, the class claims must also be dismissed.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant J.B. Hunt Transport, Inc.'s Motion to Dismiss (Doc. 44) is **GRANTED** under Rule 12(b)(1) due to Plaintiffs' lack of standing to sue. Though Plaintiffs' claims are **DISMISSED WITHOUT PREJUDICE**, the Court considers the dismissal to be final and immediately appealable. A judgment will enter concurrently with this Order.

**IT IS SO ORDERED** on this 6th day of October, 2022.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE