IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

J.B. HUNT TRANSPORT, INC.                                                                    PLAINTIFF

v.                            Case No. 5:23-CV-05094-TLB

TTEC DIGITAL, LLC, Successor in Interest to
AVTEX SOLUTIONS, LLC; and TTEC
HOLDINGS, INC.                                                                               DEFENDANTS

## BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff J.B. Hunt Transport, Inc. ("Hunt") sues TTEC Digital, LLC, who is the successor in interest to former defendant Avtex Solutions, LLC, and it also sues TTEC Holdings, Inc. (collectively, "TTEC"), for two counts of breach of contract. Hunt sues to recover over a million dollars in attorneys' fees for a data breach that never occurred and spent defending four lawsuits that were dismissed pre-discovery at the pleadings stage. TTEC is entitled to summary judgment in its favor because Hunt's claims fail on the undisputed facts as a matter of law. The first breach-of-contract claim fails because there is no evidence that TTEC breached the contract and there is no evidence that any personal data was hacked. In any event, Hunt's damages claim for its first breach-of-contract claim fails Arkansas's tacit agreement rule. The second breach-of-contract claim fails because the contract's indemnification provision did not impose an obligation on TTEC to indemnify Hunt for Hunt's own conduct as a matter of Arkansas law.

## BACKGROUND

Founded in 1982, TTEC has over 40 years of experience providing business process outsourcing, technology, consulting, and analytics services to deliver, among other things, technical computer support. *See* Declaration of Tommy Hu, Ex. 1 to Motion, at ¶ 3. At all times relevant to this action, TTEC was certified by Microsoft as a gold-certified managed partner who

could install Microsoft products. *See id*. at ¶ 4. In June 2019, Hunt contracted for TTEC to install certain Microsoft software related to the recruitment of driver applicants to become employees. Specifically, Hunt and TTEC entered into a Master Service Agreement ("MSA") to "perform the requested Services" . . . as specified . . . in the applicable Statement of Work" ("SOW"). The MSA and SOW are attached to TTEC's motion as Exhibits 2 and 3, respectfully.

The SOW sets forth that Hunt was replacing its workforce management systems, including "the portal[] to be used by Driver Candidates," with a new "Microsoft Dynamics 365 based driver recruiting system" (the "Portal") created by Microsoft. SOW, Ex. 3, §1.1-1.2. In other words, Hunt wanted a new online job application program for drivers.

Microsoft Dynamics 365 (D365) is a suite of applications that allows businesses to, among other things, monitor their supply chains, coordinate among teams, and connect directly with customers. *See* Hu Declaration, Ex. 1, at ¶ 5. The Portal is an application that uses the D365 framework to receive and store job applications, which can include an applicant's personal information. *See id*. at ¶ 6.

The SOW "define[d] the implementation project for the Microsoft Dynamics 365 based next generation driver recruiting system," including the Portal, and provided "an estimated cost, timeline, assumptions, and responsibilities for the delivery of the driver recruiting system." SOW, Ex. 3, § 1.2. Pursuant to the MSA, TTEC represented and warrantied "that the Services and Deliverables will operate as described in the [SOW] and will be free of material defects . . . for a period of sixty (60) days following the date such Services and Deliverables are accepted by" Hunt. MSA, Ex. 2, § 4.1. For the warranty to be triggered, Hunt was required to report any such alleged material defects within 60 days following the acceptance date. *Id*. Undisputedly, Hunt did not

2

make such a timely report and, as a result, it makes no breach of warranty claim in this action. *See* Hu Declaration, Ex. 1, at ¶ 8.

The SOW provided that "all required Microsoft licensing will be procured by" Hunt, and that TTEC "will be listed as Microsoft's Partner of Record (POR) for the D365 purchase and implementation." SOW, Ex. 3, § 1.7. The SOW also made clear that "[a]ll D365 modules and instances will be hosted by Microsoft." *Id*. The SOW also provided the precise manner of testing that TTEC (f/k/a "Avtex") would be allowed to perform but that Hunt also had responsibility to test user acceptance:

> All Avtex testing will be performed with a single Chromium based browser (Google Chrome browser preferred) Microsoft supports both Google Chrome and Microsoft Edge and confirms compatibility with both browsers. Avtex performs all testing in one browser due to time and budget considerations. JBHT user acceptance testing will also be performed using Google Chrome and Microsoft Edge. Testing and validation for any other browsers will be the responsibility of JBHT.

*Id.*

In terms of the development of the Portal, Hunt required "system development" be limited to:

> - **System Development**
>   All work for this project will use the following prioritization for system development:
>     - **Configuration**. Using native administration tools within the application to tailor the user experience, security model, business rules and automation.
>     - **Customization**. Using 3rd party tools (North 52, e.g.) to facilitate requirement delivery when configuration cannot do so.
>     - **Development**. Using custom code to address a requirement when configuration and customizations cannot do so.
>
> Please note that Development will not be performed, unless the following conditions exist:
>   - Both Avtex and JBHT has determined that Configuration and Customization cannot meet the requirement.
>   - JBHT explicitly agrees to use the Development option to achieve one or more requirements.
>   - JBHT agrees to the scope, budget and timeline change required by Development. This will be in the form of a Change Request provided by Avtex to JBHT.

*Id*.

Section 2 of the SOW, entitled "Project Scope of Work & Services," identified tasks related to D365 and the Portal, including those deemed "In Scope" and "89 Must Have Requirements" in Appendix A to the SOW," which included:

- "Applicant PII [Personal Identifiable Information] provided during the recruiting and application process is secure given the damage that could occur should this information fall into unscrupulous hands. The system ensures only those with roles requiring visibility see the applicant's PII."
- "System administrators can grant and restrict access as appropriate given the user's role when setting the user up. The system allows for the appropriate access to be granted."

Additional Section 2 tasks included:

- "Configuration of portal for driver application process(es)."
- TTEC providing "technical support throughout the project duration for Microsoft specific or custom developed applications."

The SOW also identified as a "key business issue" that the Portal "must address" was the mitigation of "risk of storing sensitive candidate information such as Personally Identifiable Information (PII) in personal email accounts." SOW, Ex. 3, § 1.2.

The Portal went live in 2020. Am. Compl., ECF 12, ¶ 13. TTEC continued to test, troubleshoot, and fine-tune the Portal through February 2021. *See* Hu Declaration, Ex. 1, at ¶ 8. As of February 2021, TTEC's work was done and Hunt discontinued the relationship with TTEC. *See id*.

Viewing the evidence in a light most favorable to Hunt, as the nonmoving party here, the dispute underlying this action developed as follows. On July 2, 2021, a third-party cybersecurity

4

firm – named UpGuard – notified Hunt of a configuration error in the Portal that potentially exposed the PII of job applicants to hackers (the "Security Vulnerability"). Am. Compl., ECF 12, ¶ 13. Upguard, apparently seeking to act as a "white knight," uncovered the Security Vulnerability with the Portal's <u>default Microsoft settings</u> and notified Hunt – and other users of the Microsoft Power Apps portal – of this issue. In other litigation that was pending before this Court, Hunt explained how the issue of the Security Vulnerability arose:

> In the UpGuard Report, UpGuard detailed its research on vulnerability associated with Microsoft Power Apps and provided targeted observations for several entities, including American Airlines, Ford, J.B. Hunt, and various governmental entities that used the Microsoft Power Apps. *See* McTigue Decl, Ex. A at pp. 5-10. Specifically, J.B. Hunt learned that when configured using default settings, the Microsoft Power Apps portal might enable public access to certain data. *See* SCC ¶¶ 5, 38, 46, Ex. 1.

*Wilson v. Hunt*, Case No. 5:21-cv-05194, ECF 45 (W.D. Ark. Mar. 31, 2022), Ex. 4, at p. 8.

Within five days, by July 7, 2021, Hunt responded and secured the Portal on its own, without asking anything of TTEC. *See Wilson v. Hunt*, Case No. 5:21-cv-05194, ECF 45 (W.D. Ark. Mar. 31, 2022), Ex. 4, at p. 9. Indeed, Hunt wrote to affected applicants that it "immediately took steps to secure the portal" and "reviewed permissions to access data in the cloud, made modifications for all cloud services, and implemented other measures to help prevent unauthorized access to our data." *Wilson v. Hunt*, Case No. 5:21-cv-05194, ECF 32-1 (W.D. Ark. Mar. 1, 2022), Ex. 5. Hunt told this Court in the *Wilson* litigation that it used security procedures routinely used to manage critical business systems to fix the configuration issue and to secure the Portal against potential hackers. *See Wilson v. Hunt*, Case No. 5:21-cv-05194, ECF 45 (W.D. Ark. Mar. 31, 2022), Ex. 4, at pp. 8-9. Hunt correctly described the vulnerability as not being "readily detectable":

> Upon receipt of UpGuard's notification and consistent with security procedures routinely used to manage critical business systems, J.B. Hunt promptly changed the

5

> configuration, secured the Portal, and took additional steps to prevent similar vulnerabilities in the future. *Id*. ¶ 38, Ex. 1. UpGuard has since independently confirmed that J.B. Hunt "secured" the Microsoft Power Apps portal on its Portal by July 7, 2021. *See* McTigue Decl., Ex. A at p. 6.
>
> On August 23, 2021, and while J.B. Hunt was still in the process of investigating the incident, UpGuard publicly disclosed the Microsoft Power Apps vulnerability and the Security Vulnerability for the first time by way of the UpGuard Report. SCC ¶ 43. UpGuard expressed the view that the potential vulnerability in the Microsoft Powers App that led to the Security Vulnerability was neither "adequately publicized," "adequately appreciated," nor readily detectable prior to its reporting. McTigue Decl., Ex. 1 at p. 2. Indeed, according to UpGuard, "multiple governmental bodies reported performing security reviews of their apps without identifying this issue." *Id*.

*Id*.

Hunt told this Court that it was Microsoft that made changes that fixed the Security Vulnerability going forward:

> UpGuard also stated that "Microsoft has since made changes to Power Apps portals such that table permissions are enabled by default, thereby eliminating the vulnerability for Microsoft Power Apps users going forward. *Id*.

*Id.* at p. 9. And Hunt confirmed that none of its applicants' or employees' PII had been accessed wrongfully or otherwise hacked:

> J.B. Hunt completed its investigation into the Security Vulnerability by October 18, 2021. SCC ¶ 38, Ex. 1 at 1. Through this investigation, it determined that while certain applicant and employee information "could have been" accessible between August 17, 2020 and July 2, 2021, *see id.* at 1 (disclosing extent of Security Vulnerability), it found no evidence that any unknown third party had accessed its systems or that any data was otherwise compromised. . . .
>
> At no point did J.B. Hunt indicate (and there is no evidence) that any unknown third party *had accessed* any job applicant's PII. . . .

*Id.* at pp. 9-10 (emphasis in original). Indeed, in written discovery in this case, Hunt claimed that TTEC "failed to enable a table permissions setting within the Microsoft 365 Dynamics software package that allowed unauthorized third party access to the portal via an Odata feed and created a security vulnerability within the portal," Interrog. No. 8, Ex. 9, but Hunt admitted that "it is

6

unaware of any person's personally identifiable information being accessed or compromised by any unknown third party." RFA No. 6, Ex. 8.

What is more, Hunt has written to this Court that the Security Vulnerability was not something unique to TTEC's specific work for Hunt but was a wide-ranging issue involving many Microsoft customers. Hunt wrote in another court filing in the *Wilson* case: "On July 2, 2021, [UpGuard] notified [Hunt] of a security vulnerability that existed on the third-party application – 'Microsoft Power Apps' – that J.B. Hunt and *numerous other businesses and government entities used*." *Wilson v. Hunt*, Case No. 5:21-cv-05194, ECF 57 (W.D. Ark. June 24, 2022), Ex. 6, at p. 2 (emphasis added).

Even though no person's PII was accessed wrongfully, Hunt was sued in four lawsuits, with plaintiffs generally alleging that their PII may have been exposed due to the Security Vulnerability with the Portal. In written discovery, Hunt identified the four lawsuits:

- *Wilson v. Hunt* (the case discussed above), No. 5:21-CV-05194 (W.D. Ark.);
- *Brown v. Hunt*, No. 4:21-CV-04081 (W.D. Ark.);
- *Baker v. Hunt*, Circuit Court of Cook County, Illinois; and
- *Ames v. Hunt*, Judicial Circuit Court of St. Louis County, Missouri.

The *Wilson*, *Brown*, and *Baker* lawsuits were consolidated under the *Wilson* caption in this Court and before this judge, the Honorable Timothy L. Brooks. As this Court knows, Hunt moved to dismiss pursuant to Fed. R. Civ. P. 12(b) pre-answer and pre-discovery and this Court granted the motion, dismissing the cases for lack of standing and/or lack of damages because no PII was wrongfully accessed. *See generally Wilson v. Hunt*, Case No. 5:21-cv-05194, ECF 63 (W.D. Ark. Oct. 6, 2022), Ex. 7. Hunt did not have to go through discovery in these cases because of the pre-answer dismissal.

As for the fourth lawsuit, the *Ames* case in Missouri, Hunt also moved to dismiss. Before that motion was decided, Hunt settled that case for a confidential amount. The settlement amount was identified in discovery pursuant to the protective order and TTEC views the settlement amount as nominal within the total amount demanded in this lawsuit.

Hunt then sued TTEC for breach of contract, presenting two discrete claims. First, Hunt contends that TTEC breached the contract through its "acts and omissions as alleged herein of implementing the portal for [Hunt] in such a manner so that applicants' PII was not secure or protected from unauthorized access." Am. Compl., ECF 12, ¶ 18. Second, Hunt contends that TTEC breached the contract by its "refusal to indemnify [Hunt] for all of the costs and expenses it incurred as a result of" TTEC's acts and omissions." *Id*., ¶ 19. Hunt alleges that "Paragraph 11 of the MSA requires [TTEC] to 'defend, indemnify, and hold harmless'" Hunt "from and against all claims . . . liabilities, demand, damages, losses, costs, and expenses (including reasonable attorney's fees and investigative expenses), arising out of or resulting from provision of the Services." *Id*., ¶ 16. Hunt alleges that it "incurred substantial costs and expenses as a consequence of the security vulnerability." *Id*., ¶ 17.

What were those "costs and expenses?" Hunt claims to have paid more than $1.6 million in legal fees in defending the four lawsuits (all of which were dismissed pre-discovery at the pleadings stage) and in its dealings with state regulators. Interrog. Resp. No. 6, Ex. 9.

TTEC now moves for summary judgment. As a matter of law, both breach-of-contract theories fail on the undisputed material facts.

### **SUMMARY JUDGMENT STANDARD**

Courts grant summary judgment when the pleadings and evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter

8

of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*). A fact is "material" if it could affect the ultimate disposition of the case, and a factual dispute is "genuine" if there is substantial evidence to support a reasonable jury verdict in favor of the nonmoving party. *Rademacher v. HBE Corp.*, 645 F.3d 1005, 1010 (8th Cir. 2011). This Court should view the facts in a light most favorable to Hunt, as it is the non-moving party. *See Haynes v. Reebaire Aircraft, Inc.*, 161 F. Supp. 2d 985, 987 (W.D. Ark. 2001).

## ARGUMENT

I. **The First Breach-Of-Contract Claim Fails Because There Is Not Evidence That TTEC Breached The Contract And There Is Not Evidence That Any PPI Was Hacked. Further, The Claim Fails For The Additional Reason That Hunt's Damages Claim Fails Arkansas's Tacit Agreement Rule.**

   A. **Without An Actual Data Breach And Without Evidence That TTEC Did Something Wrong In The Implementation Of The Microsoft System, There Is No Merit To Hunt's First Breach-Of-Contract Claim.**

The claim that TTEC breached the contract by allegedly failing to "[m]itigate the risk of storing sensitive candidate information such as [PII] in personal email accounts" fails on the undisputed facts. Hunt's beef is with Microsoft, not TTEC. How can TTEC have breached the contract when Hunt admits that the Security Vulnerability "existed on the third-party application – 'Microsoft Power Apps' – that J.B. Hunt and *numerous other businesses and government entities used*." *Wilson*, ECF 57, at p. 2 (emphasis added). The Security Vulnerability in the Microsoft system had nothing to do with TTEC's individual work for Hunt.

TTEC performed the implementation of the Portal – a Microsoft "out of the box" system – for Hunt consistently with all Microsoft standard practices with all Microsoft default settings in place and there is no evidence to the contrary. *See* Hu Declaration, Ex. 1, at ¶ 7. The problem with the Microsoft Power Apps – and it was a problem with the Microsoft-created program and

9

not with TTEC's implementation of it – was not detectable by TTEC given the scope of the services to be performed by TTEC for Hunt. *See id*. at ¶ 9. Once the Security Vulnerability was identified by Upguard, it was Microsoft who corrected the defect in the Microsoft system going forward, as Hunt has explained in the *Wilson* court filings discussed above.

As important, no Hunt applicant data was ever accessed because of the Security Vulnerability. How do we know that Microsoft corrected its own vulnerability and that no Hunt applicant data was ever accessed because of the Security Vulnerability? Hunt has already told this Court this information in the *Wilson* litigation. Hunt said that the Security Vulnerability was not "readily detectable" prior to the UpGuard report. *Wilson v. Hunt*, Case No. 5:21-cv-05194, ECF 45 (W.D. Ark. Mar. 31, 2022), Ex. 4, at pp. 8-9. The vulnerability was in the Microsoft system, and it was Microsoft who made changes to address the Security Vulnerability. *See id*. at p. 9. Hunt did not need TTEC to secure the portal; Hunt wrote that it secured the portal itself. *See Wilson v. Hunt*, Case No. 5:21-cv-05194, ECF 32-1 (W.D. Ark. Mar. 1, 2022), Ex. 5. The UpGuard report does not place any blame on anyone except Microsoft and does not even mention TTEC. And, most important, no Hunt applicant data was ever accessed. Accordingly, there is no merit whatsoever to the claim that TTEC breached the contract by failing to "mitigate the risk of storing sensitive candidate information." This breach-of-contract claim fails on the undisputed facts and TTEC should be granted summary judgment on this claim. Indeed, this Court dismissed the *Wilson* litigation filed against Hunt because there were "no facts showing a data breach, and there [were] no facts showing access by an unknown third party." *Wilson v. Hunt*, Case No. 5:21-cv-05194, ECF 63 (W.D. Ark. Oct. 6, 2022), Ex. 7, at p. 14. Without an actual data breach, there is no merit to Hunt's first breach-of-contract claim against TTEC.

### B. Hunt's Damages Claim Fails Arkansas's Tacit Agreement Rule.

Even if the Court determines that questions of fact exist on the issue of whether TTEC breached the contract by allegedly failing to "[m]itigate the risk of storing sensitive candidate information such as [PII] in personal email accounts," TTEC is still entitled to summary judgment on this claim because the damages sought by Hunt are not recoverable as a matter of Arkansas law. Professor Howard Brill's treatise, *Arkansas Law of Damages*, explains the tacit agreement rule that is the law of Arkansas:

> When a contract has been breached, the wronged party is entitled to those general damages that may fairly and reasonably be considered as arising naturally, or according to the usual course of things, from the breach of the contract itself. Further, the Arkansas courts have followed the English rule of foreseeable damages as originally laid out in *Hadley v. Baxendale.* The wronged party may also recover such special damages "as may reasonably be supposed to have been in contemplation of both parties at the time they made the contract, as the probable result of a breach of it." Recently, the Arkansas Supreme Court stated that "consequential damages are recoverable when they were fairly within the contemplation of the parties."

1 Arkansas Law of Damages § 4:3 (citing *Caldwell v. Guardian Trust Co.*, 26 F.2d 218 (8th Cir. 1928); *Miles v. American Ry. Exp. Co.*, 150 Ark. 114, 233 S.W. 930 (1921); *Greenway Equip., Inc. v. Johnson*, 2020 Ark. App. 336, 602 S.W.3d 142; *Hadley v. Baxendale*, 1854 WL 7208 (UK. Ex. Ct.); *Optical Partners, Inc. v. Dang*, 2011 Ark. 156, 381 S.W.3d 46).

The summary-judgment record does not establish that TTEC ever "tacitly consented" to accept responsibility and to be bound to more than ordinary contract damages. Here, there are no ordinary damages in that no PII was ever wrongfully disclosed. The "special damages" – again, in the context of allegedly failing to perform the SOW – of $1.6 million in defending meritless lawsuits filed against Hunt and dismissed at the pleadings stage are patently beyond TTEC's tacit consent under the MSA and SOW. As Hunt told this Court in the *Wilson* litigation, Hunt "determined that while certain applicant and employee information 'could have been' accessible

11

between August 17, 2020 and July 2, 2021, . . . it found no evidence that any unknown third party had accessed its systems or that any data was otherwise compromised." *Wilson v. Hunt*, Case No. 5:21-cv-05194, ECF 45 (W.D. Ark. Mar. 31, 2022), Ex. 4, at pp. 9-10.  This is a much different case if PII had been accessed and hacked.  It was not, though.  The filing of meritless lawsuits on the basis of the UpGuard report – which did not even assign any blame to TTEC – is not something that arose naturally, or according to the usual course of things, from the alleged breach of contract itself.

> Professor Brill explains further the tacit agreement rule:
>
> It is not enough if the party to be charged with breach merely knew of the special circumstances at the time the contract arose or knew that special damages would result from a breach.  In addition to this knowledge, *the facts and circumstances must be such as to make it reasonable to believe that the breaching party tacitly consented to accept responsibility and to be bound to more than ordinary damages.*  This "tacit agreement" requirement differentiates the Arkansas law from the majority of jurisdictions.  Arkansas continues to adhere to this two prong approach as a prerequisite to holding a breaching party liable for special damages in contract actions.

1 Arkansas Law of Damages § 4:3.  TTEC could not have contemplated – and certainly did not accept responsibility – at the time of contracting that a not "readily detectable" vulnerability in the Microsoft system, which TTEC installed following Microsoft's standard practices, and which did not cause any applicant's or employee's PII to be taken wrongfully, would place TTEC on the hook for $1.6 million in special damages for Hunt's defense of meritless lawsuits over the Microsoft vulnerability.  It was simply "not in the contemplation of the parties at the time the contract was made" that TTEC would have to pay over $1 million to Hunt even if there was no data breach.  *Interstate Grocer Co. v. Namour*, 201 Ark. 1095, 148 S.W.2d 175, 176 (1941).  TTEC is entitled to summary judgment on this claim.

**II.     The Second Breach-Of-Contract Claim Fails Because The Contract's Indemnification Provision Did Not As A Matter Of Law Impose An Obligation on TTEC To Indemnify Hunt For Hunt's Own Conduct.**

For its second breach-of-contract claim, Hunt contends that TTEC breached the MSA's indemnification provision. Pursuant to the MSA, Hunt is "Buyer" and TTEC is "Contractor." The indemnification provision provides:

> 11. HOLD HARMLESS AND INDEMNIFICATION:
>
> 11.1    Contractor agrees to defend, indemnify and hold harmless Buyer, its customers, Affiliates, and their officers, directors, agents, employees and assigns (each an "Indemnified Party"), from and against all claims (including copyright, trademark, or patent infringement claims), liabilities, demands, damages, losses, costs, and expenses, (including reasonable attorney's fees and investigative expenses), arising out of or resulting from provision of the Services, or occasioned by reason of Contractor or Worker(s) traveling to or from a site to perform Services or being on a Buyer or its Affiliates' or customers' site.
>
> 11.2    Contractor will not be obligated to so indemnify if the claimed infringement or misappropriation is caused by Buyer's (1) misuse or modification of such materials, (2) failure to use corrections or enhancements made available by the party from which indemnity is claimed, (3) use of the materials in combination with any product or information not provided or developed by Contractor, provided that Contractor has not provided written consent to allow the materials to be used with a non-contractor provided product, , () distribution, marketing or use of the materials for the benefit of any third party or(5) following instructions, specifications or direction provided by Buyer. Upon notice of an alleged infringement or if in Contractor's opinion such a claim is likely, or alternatively, if Buyer's rights hereunder are restricted by Contractor or a valid court order, then Contractor shall at its option and sole expense: (a) procure the right for Buyer to continue using the alleged infringing material; or (b) revise the material with non-infringing material which is equivalent in features, functionality and quality; or (c) modify the material to make it non-infringing while retaining all original features, functionality and quality; or (d) refund Buyer fees paid for respective material based on a depreciated value over three (3) years.
>
> 11.3    Each party expressly excludes liability for consequential loss or damage, loss of profit, business, revenue, and goodwill or anticipated savings.

In the MSA, "Services" is defined as follows:

> 1. <u>SERVICES</u>:
>
>    1.1   Contractor will perform the requested Services, including at any specific locations, as specified by Buyer in the applicable Statement of Work. Contractor will provide qualified personnel ("Worker" or "Workers") to perform the Services. Buyer may at any time, reasonably request the Contractor to remove a Worker and furnish a suitable replacement as soon as possible, for commercially acceptable reasons. Buyer is not liable to Contractor for payment for rejected Workers after rejection of such Workers. Workers may be employees of Contractor or Contractor's Affiliates, or subcontractors.

This indemnification provision does not impose an obligation on TTEC to indemnify Hunt for Hunt's own conduct, *i.e.*, Hunt's negligence, breach of implied contract, invasion of privacy, breach of confidence, unjust enrichment, or violation of state statute, which is all that Hunt could have been held liable for in the meritless lawsuits that were filed against Hunt.

"When a contract is unambiguous, its construction is a question of law for the court." *Fryar v. Boyett*, 64 Ark. App. 7, 11, 978 S.W.2d 304, 306 (1998). Arkansas law is well-settled on the enforceability of indemnity agreements and, in particular, indemnity agreements that attempt to impose an obligation on another party to indemnify for someone else's negligence or conduct. "Indemnity agreements are construed strictly against the party seeking indemnification." *Chevron U.S.A., Inc. v. Murphy Exploration & Prod.* Co., 356 Ark. 324, 330, 151 S.W.3d 306, 310 (2004). While contracts are generally subject to the rules of construction, *Nabholz Constr. Corp. v. Graham*, 319 Ark. 396, 400, 892 S.W.2d 456, 459 (1995), language creating the obligation to indemnify another for his own negligence must be "expressed in clear and unequivocal terms and to the extent that no other meaning can be ascribed," *Pickens-Bond Constr. v. North Little Rock Elec. Co.*, 249 Ark. 389, 394, 459 S.W.2d 549, 553 (1970). "[T]he liability of an indemnitor for the negligence of an indemnitee is an extraordinary obligation to assume, and we will not impose it unless the purpose to do so is spelled out in unmistakable terms." *Arkansas Kraft Corp. v. Bayed Sanders Constr.*, 298 Ark. 36, 39, 764 S.W.2d 452, 453 (1989). "[A]greements to indemnify an indemnitee against its own negligence are generally disfavored, closely scrutinized, strictly

14

construed against the indemnitee and in favor of the indemnitor, and will not be upheld unless expressed in such clear and unequivocal terms that no other meaning can be ascribed." 1 Arkansas Law of Damages § 17:10.

The Arkansas Supreme Court regularly rejects seemingly broad and all-encompassing language as imposing this onerous obligation. For example, the Supreme Court concluded that expansive language as "all liability, claims, demands or judgments for damages arising from accidents to persons or property occasioned by Subcontractor" did not clearly and unequivocally reflect the intent required, especially given the lack of specific reference to the general contractor, *i.e.*, the indemnitee. *See Nabholz Constr. Corp.*, 319 Ark. at 401-02, 892 S.W.2d at 459 (discussing *Paul Hardeman, Inc. v. J. I. Hass* Co., 246 Ark. 559, 439 S.W.2d 281 (1969)) (enforcing indemnification agreement when indemnity clause clearly obligated indemnitor to indemnify indemnitee for damages arising from indemnitee's own negligence).

Language similar to the MSA has been held *not* to impose this type of onerous indemnity obligation. In *Wal-Mart Stores, Inc. v. Black & Decker (U.S.), Inc.*, 2009 WL 2524570 at *3, No. 09-5062 (W.D. Ark. 2009), Black & Decker was sued by the purchaser of a grinder for personal injuries sustained as a result of an alleged defect with that product that had been purchased at Walmart. The purchaser amended the complaint to name Walmart as a defendant with specific claims directed at Walmart for its violation of the Texas Deceptive Trade Practice Consumer Protection Act, *i.e.*, a basis for liability independent of alleged negligence of Black & Decker. *Id.* at *4. Black & Decker settled the claims against it, and the purchaser/plaintiff amended his complaint to make clear that the only claims against Walmart were claims of its independent actions or inactions. *Id.* at *5. Black & Decker declined to indemnify Walmart for the remaining action. *Id.*

In the action on the indemnity contract, Judge Robert Dawson concluded that the indemnification language in the vendor agreement between Walmart and Black & Decker did not extend to indemnification for Walmart's independent negligence, which was the only claim against Walmart. *Id.* at *13. Judge Dawson explained:

> The indemnification provision in question makes clear that Black & Decker must indemnify Wal-Mart for "any and all" losses resulting in whole or in part from "any" actual or alleged defect in Black & Decker merchandise sold by Wal-Mart. While these words appear to have the breadth and scope to encompass claims against Wal-Mart for its sole negligence, they are insufficient, as a matter of Arkansas law, to support Wal-Mart's assertion that Black & Decker must indemnify Wal-Mart for its own negligence. As the Arkansas Supreme Court concluded in *Pickens-Bond* and *Arkansas Kraft,* indemnification requirements for "damage or injury from whatever cause" or "any and all liabilities or claims" simply fail to speak to indemnification for an indemnitee's sole acts or omissions. Nowhere do we find language remotely resembling the "joint, concurrent, or sole negligence" indemnification provision upheld in *Chevron U.S.A.* As a result, despite the breadth of the language used in the Vendor Agreement, there is a complete absence of language that spells "out in clear, unequivocal, unmistakable terms the indemnitor orders intention to obligate itself to indemnify for the indemnitee's negligence."

*Id.* at *4. Because Walmart could only be held liable in the underlying litigation based on its own wrongdoing and not the acts or omissions of Black & Decker, indemnity was not available. *Id*.

In the instant action, Hunt seeks indemnity for the costs incurred in defending against four lawsuits (and the related costs of notifying states' attorneys' general and job applicants). But the allegations against Hunt in these lawsuits involved exclusively Hunt's own negligence. For instance, in the operative complaint filed in *Wilson* (following consolidation of the *Wilson*, *Brown*, and *Baker* lawsuits), the plaintiffs begin:

> 1. Plaintiffs bring this class action against Defendant for its failure to properly secure and safeguard personally identifiable information that Defendant required from job applicants as a condition of potential employment, including names and Social Security numbers (collectively, "personally identifiable information" or "PII").
>
> 2. Plaintiffs also allege that Defendant failed to provide timely, accurate, and adequate notice to Plaintiffs and Class Members that their PII had been exposed. Defendant failed to inform Plaintiffs and Class Members of precisely what types of personally identifiable information was unencrypted and is now in the possession of unknown third parties.

*Wilson v. Hunt*, Case No. 5:21-cv-05194, ECF 32 (W.D. Ark. Mar. 1, 2022).

The allegations made by the plaintiffs in *Wilson*, *Brown*, and *Baker* implicate Hunt's own alleged wrongdoing, not TTEC's. In support of their claims against Hunt for negligence, breach of implied contract, invasion of privacy, breach of confidence, unjust enrichment, or violation of state statute, plaintiffs alleged:

> **Securing PII and Preventing Breaches**
>
> 54. Defendant could have prevented this Data Breach by properly securing and encrypting the PII of Plaintiffs and Class Members. Alternatively, Defendant could have destroyed the data, especially the PII of those who applied for jobs years before the Data Breach.
>
> 55. Product documentation for Microsoft Power Apps alerted Defendant that there were conditions under which data could be made publicly accessible, and the main Power Apps marketing page listed the ability to access data either anonymously or through commercial authentication as one of the top features. Defendant ignored these warnings.[17]
>
> 56. Defendant's policies on its website include promises and legal obligations to maintain and protect PII, demonstrating an understanding of the importance of securing PII. For example, Defendant's Privacy Policy provides in part that they "have implemented technical, administrative, and physical security measures to protect your personal information from unauthorized access or disclosure and improper use." The Policy goes on to state that "access to your personal information is restricted in our offices. Only employees who need [it] to perform a specific job are granted access to personal information."[18]
>
> 57. Defendant's negligence in safeguarding the PII of Plaintiffs and Class Members is exacerbated by their own repeated pronouncements to Class Members that Defendant would protect and secure their sensitive data.

17

*Id*.

Under Arkansas law, there must be an express intent in an indemnification provision to support an indemnitee's claim that it should be indemnified for the indemnitee's own conduct. *See, e.g.*, *Arkansas Kraft Corp.*, 298 Ark. at 39, 764 S.W.2d at 453 ("While no particular words are required, the liability of an indemnitor for the negligence of an indemnitee is an extraordinary obligation to assume, and we will not impose it unless the purpose to do so is spelled out in unmistakable terms."). Such purpose does not exist here and is certainly not spelled out in unmistakable terms. TTEC is entitled to summary judgment on the second breach-of-contract claim for this reason alone.

In any event, § 11.3 of the MSA makes clear that "consequential loss or damage" are excluded from the indemnification provision. As briefed above, with no data breach or hack whatsoever caused by Microsoft's Security Vulnerability, TTEC could not have reasonably anticipated that Hunt would seek $1.6 million for essentially defending four meritless lawsuit. The $1.6 million is simply not recoverable under the terms of the indemnification provision as it was consequential damages not reasonably anticipated without an actual data breach.

## CONCLUSION

TTEC is entitled to summary judgment on both of Hunt's breach-of-contract claims. The first breach-of-contract claim fails because there is no evidence that TTEC breached the contract and there is no evidence that any PPI was hacked. In any event, Hunt's damages claim fails Arkansas's tacit agreement rule. The second breach-of-contract claim fails because the contract's indemnification provision did not impose an obligation on TTEC to indemnify Hunt for Hunt's own alleged conduct as a matter of Arkansas law. This case should be dismissed with prejudice.

        /s/ Brandon B. Cate
Vincent O. Chadick
Ark. Bar No. 94075
Brandon B. Cate
Ark. Bar No. 2001203
Meredith M. Causey
Ark. Bar No. 2012265
Andrew S. Dixon
Ark. Bar No. 2019193
Attorneys for Defendants
QUATTLEBAUM, GROOMS & TULL PLLC
4100 Corporate Center Drive, Suite 310
Springdale, Arkansas 72762
Telephone: (479) 444-5200
Facsimile: (479) 444-6647
E-Mail: vchadick@qgtlaw.com
E-Mail: bcate@qgtlaw.com
E-Mail: mcausey@qgtlaw.com
E-Mail: adixon@qgtlaw.com

## **CERTIFICATE OF SERVICE**

     I hereby certify that on this 19th day of April, 2024, I filed a copy of the foregoing with the Clerk of the Court using the ECF electronic filing system, which shall send notification of such filing to the following counsel of record for plaintiff:

**Jason H. Wales, Esq.**
at jason@wm-lawyers.com; tracy@wm-lawyers.com


        /s/ Brandon B. Cate